WORSHIP VENTURES OF ARKS, L.L.C., Plaintiff
v.
JUDD MINISTRIES, INC., Defendant, and
JUDD MINISTRIES, INC., Third Party Plaintiff,
v.
ARKS, INCORPORATED and ROBERT FRANKLIN KNOWLES, Third Party Defendants.
No. COA09-123.
Court of Appeals of North Carolina.
Filed November 3, 2009
This case not for publication
Sanford W. Thompson, IV, and Tart Law Group, by Joseph Tart, for plaintiff and third party defendants.
No brief submitted by defendant or third party plaintiff.
ELMORE, Judge.

BACKGROUND

A. The complaint.
On 9 March 2007, Worship Ventures of Arks, L.L.C. (plaintiff), filed a complaint against Judd Ministries, Inc. (defendant). The complaint alleged that, on or around 15 March 2006, the parties had entered into a Build to Minister Lease/Purchase Agreement (the lease agreement) by which defendant leased from plaintiff a facility to conduct church services. According to the lease agreement, defendant agreed to pay monthly rent of $17,752.00 and monthly insurance premiums of $235.50 in exchange for use of the facility. The complaint alleged that defendant had made no rental payments and "repudiated the contract by indicating that they [sic] cannot and will not make payment as obligated under the contract[.]"
The complaint set forth two causes of action: breach of contract and repossession of premises pursuant to the terms of the lease agreement. Plaintiff asked the court to order defendant "to immediately vacate the premises of the facility" and grant plaintiff "the right to immediately enter and seize such premises" as well as damages, costs, and attorneys' fees.
In its answer, defendant replied that the lease agreement was not enforceable against defendant. However, defendant countered that even if the lease agreement were enforceable, plaintiff had materially breached the lease agreement, thereby suspending any obligations that defendant had under it. Defendant then counterclaimed against plaintiff and filed a third-party complaint against Arks, Incorporated and Robert Franklin Knowles. In the counterclaim, defendant alleged that the parties had entered into a Consulting Services Master Agreement (the consulting agreement) on or about 3 April 2002. Under the consulting agreement, plaintiff agreed to provide consulting services and act as a development company to help defendant build a 30,000 square foot church building in Wendell. The parties then executed a letter of agreement formalizing plaintiff's obligation to negotiate and oversee construction of the church project on defendant's behalf. The counterclaim alleged that the parties had agreed that the new church facility would include a preschool and that the preschool was an integral and necessary part of the project and was expected to provide a significant revenue stream. After the facility was constructed, defendant discovered that it did not contain a preschool; without the expected $15,000.00 per month income stream from the preschool, defendant "found itself in financial difficulty" and "was thereafter coerced into executing" the lease agreement on 24 April 2006 in order to continue operating the church facility.

B. The motion for summary ejectment.
On 19 February 2008, plaintiff filed a motion for summary ejectment pursuant to N.C. Gen. Stat. § 42-26. Plaintiff alleged that defendant had failed to pay rent and was in arrears in the amount of $358,008.72. Pursuant to the lease agreement, plaintiff alleged that it was entitled to terminate the lease, terminate defendant's possession of the premises, and re-enter the premises. According to the motion, defendant was "holding over" and continuing "in possession of the premises without permission of [plaintiff] after demand ha[d] been made for its surrender."
Defendant opposed the motion and executed affidavits by Pastor William E. Judd of Judd Ministries and Pastor Judd's wife, Luerever Pridgen Judd, who was also a member of the ministry's board of directors. According to the affidavits,
Knowles took advantage of the situation which he created by not following through on the application for the preschool as promised, and that the lack of revenue from the expected preschool was the circumstance which placed Judd Ministries in a financial bind. Under the terms of the [lease agreement], Worship Ventures purported to become the owner and lessor of the church facility.
The affidavits alleged that the lease agreement was unenforceable because material terms and conditions were omitted, plaintiff provided no consideration, congregational approval as required by the lease agreement was never obtained, and church leadership approval as required by the lease agreement was never obtained.
On 23 June 2008, Judge E. Leon Stanback, Jr., denied plaintiff's motion for summary judgment. A valid agreement between the parties is a prerequisite to an order of summary ejectment and Judge Stanback determined, as a matter of law, that the lease agreement was "not an enforceable agreement given the mistakes and omissions in the document[.]" Within the week, plaintiff filed its notice of objection and exception to Judge Stanback's order.

C. The motion for summary judgment.
On 30 June 2008, defendant moved for summary judgment. In response, plaintiff filed a motion pursuant to Rule 56(f) seeking a continuance so that plaintiff could "obtain depositions in order to establish facts essential to opposition [of] the motion for summary judgment[.]" Plaintiff offered an affidavit executed by its principal, Robert Knowles, which offered the following explanation of the lease agreement's genesis: William Judd approached Knowles in early 2006 and told him that Judd Ministries had fallen behind in its payments to both Pathway Investments, LLC (Pathway), which held the note for the land, and First Federal Savings Bank (First Federal), which had issued the construction loan. The Pathway loan was secured by the church property and the construction loan was secured by the sanctuary building, seven acres of the church property, and a personal guarantee by Judd. Judd asked Knowles to help Judd Ministries avoid foreclosure, and Knowles suggested that Worship Ventures could borrow money to pay off Judd Ministries's debt to Pathway and First Federal and then lease the property back to Judd Ministries with an option to purchase. According to the affidavit,
Worship Ventures explained it would borrow the money and pay off Judd Ministries, Inc.'s loans to both the landowner and to First Federal Savings Bank; Judd Ministries, Inc. would have a three-year option to purchase the property for the amount of Worship Ventures' loan ($2.3 million); and Judd Ministries, Inc. would pay Worship Ventures monthly rent in the amount of $17,752 (the same amount Worship Ventures would pay each month to First Federal Savings Bank for the $2.3million [sic] loan).
Then,
William Judd communicated that Judd Ministries, Inc. accepted the terms and transferred the land and building to Worship Ventures . . . so Worship Ventures could get the loan and use the money to pay off Judd Ministries, Inc.'s debts to the landowner and First Federal Savings Bank; Judd Ministries, Inc. accepted the option to purchase and agreed to pay Worship Ventures . . . rent in the amount of $17,752 a month.
Plaintiff indeed borrowed $2.3 million from First Federal at eight percent interest over three years and paid off defendant's debts to Pathway and First Federal, including interest and late fees. Defendant executed a corporate resolution authorizing it "to sell to Worship Ventures of ARKS, LLC, such realty, fixtures and or personal property located at 1100 Eagle Rock Road, Wendell, NC 27591, upon such terms and conditions as the officer or officers hereinafter authorized in their discretion may deem necessary or advisable." The Wake County tax records show that plaintiff was the owner of the property as of 25 April 2006.
Nevertheless, on 10 September 2008, Judge Orlando F. Hudson, Jr., entered an order granting defendant's motion for summary judgment against plaintiff. The order does not include any findings of fact or conclusions of law. However, at the hearing, defendant argued that Judge Stanback's earlier conclusion of law that the lease agreement was unenforceable effectively resolved the legal issues set forth in plaintiff's complaint.
Plaintiff now appeals both Judge Stanback's order denying summary ejectment and Judge Hudson's order granting summary judgment to defendant. For the reasons stated below, we reverse and remand both orders.

ARGUMENTS

A. Summary Ejectment.
Plaintiff first argues that Judge Stanback erred by determining that the entire lease agreement was unenforceable and, thus, summary judgment was inappropriate. We agree.
A landlord's remedy of summary ejectment is statutorily prescribed by N.C. Gen. Stat. § 42-26, which provides, in relevant part:
(a) Any tenant or lessee of any house or land, and the assigns under the tenant or legal representatives of such tenant or lessee, who holds over and continues in the possession of the demised premises, or any part thereof, without the permission of the landlord, and after demand made for its surrender, may be removed from such premises in the manner hereinafter prescribed in any of the following cases:
* * *
(2) When the tenant or lessee, or other person under him, has done or omitted any act by which, according to the stipulations of the lease, his estate has ceased.
N.C. Gen. Stat. § 42-26(a) (2007). Summary ejectment applies only "to a case in which the tenant entered into possession under some contract or lease, either actual or implied, with the supposed landlord, or with some person under whom the landlord claimed in privity, or where the tenant himself is in privity with some person who had so entered." Jones v. Swain, 89 N.C. App. 663, 668-69, 367 S.E.2d 136, 139 (1988).
To successfully maintain an action for summary ejectment, a plaintiff needs "only to allege a violation of the terms of the lease entitling plaintiff to re-enter the leased premises[.]" Chrisalis Properties, Inc. v. Separate Quarters, Inc., 101 N.C. App. 81, 87, 398 S.E.2d 628, 632 (1990). However, "[u]nder Subsection (2), a breach of the lease cannot be made the basis of summary ejectment unless the lease itself provides for termination by such breach or reserves a right of reentry for such breach." Stanley v. Harvey, 90 N.C. App. 535, 537, 369 S.E.2d 382, 384 (1988) (citing Morris v. Austraw, 269 N.C. 218, 222, 152 S.E.2d 155, 159 (1967)).
Here, the lease agreement specifically provided for termination and reentry following a breach of defendant's obligation to pay rent:
24. Default
A. Lessee's Default. A default under this Lease by Lessee shall exist if any of the following occurs:
(i) If Lessee fails to pay within five (5) days after Lessee's receipt of written notice from Lessor any Rent or any other sum required to be paid hereunder when due[.]
* * *
B. Remedies. Upon a default, Lessor shall have the following remedies, in addition to all other rights and remedies provided by law or otherwise provided in this Lease, to which Lessor may resort cumulatively or in the alternative:
* * *
(ii) Lessor may terminate lessee's right to possession of the Premises at any time by giving written notice to that effect, and re-let the Premises or any part thereof. Lessee shall be liable immediately to Lessor for all costs Lessor incurs in re-letting the Premises or any part thereof[.]
* * *
D. Acceleration. Upon Lessor's termination of this lease, Lessee expressly agrees and understands that unless prohibited by applicable State law, the entire remaining balance of unpaid rent for the remaining term of this Lease shall ACCELERATE, whereby the entire sum shall become immediately due, payable, and collectible.
We see nothing in the lease agreement that would render it unenforceable. Although defendant has not submitted a brief on appeal, it argued in the court below that the omissions from section 3 of the lease agreement rendered the entire contract unenforceable. Section 3, "Improvements To be Constructed by Lessor," states, in its entirety:
Lessor shall erect on the Premises at the completion of all due diligence and permitting process, a (NUMBER) sf building with a 10 ft eve height, a 5/12 pitch gable roof, paring and landscaping according to the ordinances of the City of (CITY NAME). The sanctuary will have a vaulted ceiling and the balance of the building will be arranged and constructed according to plans and specifications prepared by (Company Name) a Design Professional and registered engineer in the (State Name)
Site Work not to exceed $(DOLLAR AMOUNT) Land Payoff shall not exceed $(DOLLAR AMOUNT)
The Improvements shall be erected under the direction of Design Professional, whose decision in writing on any matter relating to the erection of the Improvements shall be final. The Improvements shall be erected according to law and shall be completed without delay except for such delay as may be caused by strikes or lockouts, or other causes not under the control of Lessor. Lessor shall erect the Improvements at its own expense, and the Improvements and the Property shall at all times be owned by Lessor.
The parties contemplate that the Improvements will be completed on or before _____________ (the "Completion Date").
However, the lease agreement also states that "if Lessor, for any reason whatsoever, is unable to substantially complete the Improvements on or before Completion Date, Lessor shall not be liable to Lessee for any loss or damage therefrom, nor shall this Lease be void or voidable." This clause makes clear that completion of the improvements was not essential to the lease agreement. If the improvements had been essential to the lease agreement, then failure to substantially complete them would have resulted in damages to defendant.
A lease is a contract for valuable consideration whereby one agrees to let another have the occupation and profits of realty for a definite period of time. The essentials of a lease creating an estate for years are (1) the names of the parties (lessor and lessee); (2) a description of the demised realty; (3) a statement of the term of the lease; and (4) the rent or other consideration.
Satterfield v. Pappas, 67 N.C. App. 28, 35, 312 S.E.2d 511, 515 (1984) (citations omitted). N.C. Gen. Stat. § 22-2 requires that all "contracts for leasing lands exceeding in duration three years from the making thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized." N.C. Gen. Stat. § 22-2 (2007). Thus, this Court concluded that
[i]f all essential elements of a contract to convey or lease land have been agreed upon by the parties and are contained in some writing or memoranda, signed by the party to be charged or his authorized agent, then there can still be a valid, binding contract to convey or lease land, even if there is no agreement on other non-essential terms.
Satterfield, 67 N.C. App. at 35, 312 S.E.2d at 515-16.
The term of the lease agreement is for three years, which brings it just outside the requirements of § 22-2. Nevertheless, we have before us a written lease agreement that contains all of the essential elements of a lease  names of the parties, a description of the demised realty, a statement of the term and the lease, and the rent  and, thus, a valid, binding contract to lease land existed, even if the parties had not committed to writing one non-essential term. The requirements for lease contracts of three years or less in duration are no more strict than for those contracts that must be reduced to writing pursuant to § 22-2. Accordingly, the lease agreement in question was enforceable and the trial court erred by finding otherwise.
Having determined that the lease agreement between the parties was valid and enforceable, we turn now to whether plaintiff satisfied the summary ejectment requirements. Defendant, as the tenant under the lease agreement, failed to make rent payments, which led to its default under specific default provisions of the lease agreement. The lease agreement required that plaintiff give defendant written notice of any default, and the record contains letters and facscimiles showing that plaintiff gave the required notice to defendant. Accordingly, we hold that the trial court should have granted plaintiff's motion for summary ejectment and reverse the order granting summary judgment to defendant as to summary ejectment.

B. Summary Judgment.
Plaintiff also argues that Judge Hudson erred by granting defendant's motion for summary judgment as to all of plaintiff's claims. Because the lease agreement was valid and enforceable and Judge Stanback improperly denied plaintiff's motion for summary ejectment, we hold that there exist genuine issues of material fact with regard to plaintiff's claim.

CONCLUSION
Accordingly, we reverse both orders of the trial court below and remand for reconsideration not inconsistent with this opinion.
Reversed and remanded.
Judges BRYANT and CALABRIA concur.
Report per Rule 30(e).